## RIPARIAN RIGHTS ON ORCHARD ISLAND.
### Common Pleas Court of Logan County.

FRANK J. BUSCH v. S. L. WILGUS.

#### Decided, August 21, 1922.

*Rights of Owner of a Lot Running to the Water Line of Island in Canal Reservoir—As Against Lessee from the State of a Shore Strip.*

1. Where the state of Ohio acquired land in fee for the purpose of building a reservoir in which to store water as a feeder to the Miami canal, and in so impounding the water a high point in the lands so acquired was surrounded by the water, an "island" is thus formed.

2. Where such an "island" is conveyed by the state, by its proper agents, by no other description than "Orchard Island," situate in Logan County Reservoir, containing 83.89 acres, and giving the survey numbers and without restriction or reservation, the conveyance is to ordinary low water mark and riparian rights pass to grantee and his successors in title. It being within the power of the grantor to have made restrictions or reservation in the instrument, the doubtful points are construed most strongly in favor of the grantee.

3. Where an "island" is platted into lots, streets, parks, etc., and the lots fronting on the water are shown on the plat without any space or margin between the lot and low-water mark, the lot owner in the absence of restriction to the contrary, takes title to the land fronting on the lake to ordinary low water mark.

4. Injunction will lie against one who attempts to take possession and occupy the shore of a platted lot fronting on Indian Lake, on Orchard Island, for his own use and purpose, by virtue of a lease granted from the state from low water mark to a countour line run above the level of the wasteweir of the reservoir, passing through or across such lot.

5. One taking title to a lot on Orchard Island, fronting on Indian Lake, takes it subject by implication to an easement arising by necessity occasioned by the rise and fall or flow of the waters in the reservoir.

*Harry F. Sayre,* and *West & West,* for plaintiff.
*Southard & Godwin,* for defendant.

HOVER, J.

On the 23d day of November, 1921, plaintiff filed his petition in this court, wherein he claims that he is the owner of Lot No. 138, situated on Orchard Island, Indian Lake Park, Logan county, Ohio, and a tract of land lying between the west line of said lot and low water mark. The lot is improved with a cottage. Plaintiff says further that defendant, without authority of law and in violation of his rights, has caused the ground to be dredged up from the bottom of said lake in front of said lot (No. 138) and along the west side thereof, preparatory to building a board walk along the west side of said lot inside of the low water mark: that building said board walk will interfere with his ingress and egress from the lake to his property, and will interfere with and destroy a valuable appurtenance of said lot, to-wit, the free and unobstructed use of his said water front of his property, and will interfere with and prevent boats from access to plaintiff's property.

Injunction is prayed and temporary restraining order was granted, enjoining defendant from proceeding with the construction of the board walk and from interfering with or obstructing in any way the free ingress and egress to said property, as prayed in the petition.

The defendant, by his amended answer, says that he admits that he is constructing a board walk from Sandy Beach Island to Midway Island and from Midway Island to the mainland of Orchard Island, under and by virtue of a certain lease or leases from the state of Ohio. One of the leases, relied upon for such authority, contains the provisions following:

"Permission to construct and maintain a board walk and dock landing along the water front of Indian Lake that lies between the ordinary low water line of said lake and contour line run one foot above the wasteweir line of said lake, commencing at the north end of Lot No. 137 and extending thence northeasterly across the west end of Oak street and along the west side of Lot No. 138, as shown on the recorded plat of the allotment of lands on Orchard Island in Indian Lake, 170 feet, more or less to the extreme north end of said Lot No. 138, and being part of the N½ of Section 36, Washington Township, Logan county, Ohio."

Defendant denies all other averments in the petition contained. Defendant further says that plaintiff gave his verbal consent and permission to build the walk and with full knowledge of the building and preparation to build, and without objection until after much of the work was done, the plaintiff took from A. R. Tarr a quit claim deed for the tract of land lying west along Lot No. 138 to low water mark in Indian Lake; which, defendant claims, gave plaintiff no title, and that plaintiff is now estopped from complaining of the construction of said board walk.

Which defenses, consisting of the first, second and third defenses (being so separately stated), the plaintiff by reply denies generally.

From the pleadings it will be observed that plaintiff claims the title in fee simple to Lot No. 138 on Orchard Island from Oak street to the water's edge, with free right to the use of and access to the waters of Indian Lake; while it is contended on the part of defendant that the state owns and has the right to lease the land of Orchard Island, of which Lot 138 is part, from a certain contour line run two feet above the wasteweir line to low water mark.

The principal question involved in the case is: Does the state of Ohio own the land bordering Orchard Island from a contour line run two feet above the wasteweir outward or downward to low water mark? If the state does so own and control such a strip of land, then it may lease it against the objection of plaintiff, and defendant's contention should be upheld. If the state does not so own and control such strip of land, then it can not lease it and the claim of plaintiff should be maintained.

The evidence shows that an artificial body of water was created by the state of Ohio by building a dam across the Miami River in Logan county: that in the basin of the territory so filled with water was a very small natural body of water known as "Indian Lake," and through this small lake and the basin of territory flowed the Miami River: and that by so impounding the water, it was made to cover several thousand acres of land. This artificial body of water was known as the Lewistown Res-

ervoir and was constructed in about 1855, for the purpose of feeding the water into the Miami Canal as needed for navigation purposes. The dam was constructed with certain safety devices, one of them being a "gate" which can be opened and closed, thereby permitting the water to flow out of the reservoir in such quantities as desired, or to retain the water within the embankments by closing the "gate." When the "gate" is closed, the volume of water within the embankment increases and the water creeps up on the land of the shores to a higher level. Another safety device is the wasteweir. This device is part of the embankment or dam, being constructed probably three or four feet lower than the top of the embankment, for a distance of about 700 feet, thus allowing the water to "spill" or "waste" over the embankment during the time of flood or high water, thereby lessening the danger of breaking the dam by the great pressure of the water against it. When the "gate" is closed for a period of time long enough, the water will rise and flow over the wasteweir, provided the river is flowing enough water into the reservoir to cause such an effect. When the water is high during a rainy season, the gate may be open to its full capacity and the water flowing over the wasteweir a foot or two or more, deep; and during such times of high water, the level has crept up and up to high water mark on the lands bordering on and islands in the reservoir.

The state of Ohio acquired the necessary lands for the construction of these works as a "feeder" to the Miami Canal. The original reservoir was later enlarged and contains now some 7,200 acres. By recent enactment of the Legislature (Sec. 469, G. C.), this body of water and the lands adjacent thereto are set apart as a public park and is named and designated "Indian Lake." When the state acquired the lands necessary for the construction of the reservoir, the dam was built and the water impounded therein. Some of the land was higher than the level of the wasteweir and this the water did not cover, but such high points were surrounded by water, thus forming islands in the artificial body of water. Some twenty-five such islands of various sizes were thus formed and have since been

designated by appropriate names. In this manner, Orchard Island, the subject-matter of this litigation, was formed. This island was never overflowed by the water, nor can the water be raised high enough to overflow it.

By virtue of an act of the Legislature, passed April 29, 1872, (69 Ohio Laws, 194) and amended March 1, 1877, the state by its proper officers sold and conveyed ''Orchard Island'' to Alonzo C. McClure by deed dated February 25, 1884. The description of the land sold and conveyed by this deed is as follows:

''Now, therefore, in pursuance of said act, I, George Hoadly, Governor of the State of Ohio, in consideration of the payment of said sum of $692.69 to the state of Ohio and in pursuance of the power vested in me by law, do hereby grant, bargain, sell and convey to the said Alonzo C. McClure, and to his heirs and assigns forever, the following described premises, situate in Logan County Reservoir, viz: Orchard Island, being a part of the northeast quarter of Section 36, town 6, S. range 8 E., containing 83.89 acres of land.''

There are no reservations in the deed. All reference to boundary lines are omitted. The description is ''Orchard Island,'' containing 83.89 acres of land.

When Alonzo C. McClure bought this ''island,'' by what boundaries was his title limited?

''The intention being plain, parol evidence is admissible to identify the land, but not to prove an intention different from the terms of the deed.'' *Barton* v. *Morris,* 1 Ohio, 408.

''Where the description alludes to facts beyond the deed, parol evidence may be offered, not to contradict the description, but to locate the deed upon the land.'' *Eggleston* v. *Bradford,* 10 Ohio, 312.

What did the state of Ohio part with when it sold and conveyed Orchard Island to Alonzo C. McClure?

The question of authority of the state to convey is not raised, and the sufficiency of the instrument of conveyance is in no manner attacked. The grantor had the whole title and was a general and unrestricted owner in fee simple, fully authorized to convey. No grantee of McClure has any larger title than the

state granted him under the description in the original deed. The state in its deed to McClure made no reservation; and in terms no boundaries were mentioned.

McClure conveyed the island and through various grantees, plaintiff derives his title. The Orchard Island Improvement Company platted the island, laying out streets, parks and lots, and designating the lots by number and some of the lots bear figures apparently intended to show the dimensions of the lots, but no description or dedication was filed with the plat.

After plaintiff here purchased Lot 138, believing that he owned the land to the water, and learning that the state claimed the land below a certain contour line run one foot or two feet above the level of the wasteweir, he took a quitclaim deed from A. R. Tarr (a successor in title from the Orchard Island Improvement Company, a successor in title from McClure), covering the disputed ground, for the purpose of quieting the title to the low water mark in himself. If this ground was conveyed by the state to McClure, then his successors in title would have it, barring reservations by a subsequent grantor, without such special description as used in the quitclaim deed from Tarr to plaintiff, and in such event the quitclaim deed would add nothing to the title of plaintiff.

The state, being a general owner in fee, sold and conveyed by its deed the island.

"An island is a body of land entirely surrounded by water." Harper's Georgraphy, p. 5.

"An island is a body of land surrounded by water." Cyc., 23, p. 357.

"Orchard Island" is the only description of the premises conveyed by the state, except the survey numbers and the number of acres, which are positive, and as an "island" was conveyed, then it must be assumed that the natural object that bounds the "island" is the water.

The intention of the parties, as shown by the instrument, must control.

The boundaries called for, by inference, in the deed is the

water, for an island can be bounded by nothing but water. The state sold for a consideration and conveyed "Orchard Island," certainly nothing more and nothing less. The quantity called for is 83.89 acres. But the quantity is not important, for a call for quantity must give way and yield to metes and bounds (*Hamil* v. *Carr,* 21 O. S., 258). The metes and bounds in this deed are as plain as if they had been written therein. Any restrictions, limitations, or reservations that might have been written in the deed are absent. In law, under the facts as proven, what did the state of Ohio convey to McClure?

In England, the shore between high and low water marks belongs to the state, and consequently grants or conveyances of lands bounded on tidewaters are presumed to extend to high water mark only. Other words must be employed in the conveyance clearly indicating the purpose or the intent to convey lands under water, in order to pass title thereto.

This rule does not obtain in America to the same extent, but rather, for instance the Great Lakes of the United States are as much public property as the sea, and the boundary of the riparian owners extends to the line at which the water usually stands, when unaffected by disturbing causes. 34 O. S., 492.

Land lying on the Ohio river between high and low water mark is not common to the public, but may be conveyed by the adjacent proprietors whose land bounds on the river. *Blanchard* v. *Porter,* 11 O., 138.

The general rule in Ohio is that where lands border on a navigable stream, in the absence of reservation to the contrary, title passes to the center or "thread of the stream." This rule was laid down in 1828 in *Gavit* v. *Chalmers,* 3 Ohio, 496. Since that decision, the doctrine therein announced has been steadily maintained by the Supreme Court. *Lemback* v. *Nye,* 47 O. S., 336.

A lake is navigable for this purpose if it is available for general use by pleasure boats, although not utilized for commercial purposes. *Lamprey* v. *State,* 52 Minn., 181.

However, in the consideration of the circumstances surrounding this case, there is no difference in the application of the

rule whether Indian Lake be navigable or non-navigable, as it is conceded by all that the state owns the land under the water below low water mark, and has control thereof. It is apparent at once that the rule that title passes to the "thread of the stream," or center of the pond or lake does not apply here.

Orchard Island is practically round; and to hold that title passed to the center of the body of water surrounding it, would create an awkward and impossible situation. No such intention appears from the instrument nor from the acts or conduct of the parties. Neither could justice be done by attempting to apply that rule here.

When the parties omitted from the conveyance all reference to "high water mark," "low water mark," "shore," "meanderings of the water line," "water's edge," "beach," or any other descriptive word or phrase, what did they intend? An "island" is surrounded by water, so that when the "island" was conveyed by the state, by the descriptive terms used, it was equivalent to conveying land to the water's edge or along the margin of the lake—meaning the line where the earth and the water meet around the island. The broad term is necessary for the reason that the deed contains no word of limitation. There is no reason for any different application of the rule, whether the body of land is surrounded by water, or the body of water is surrounded by land. The circumstances existing at the time of this conveyance, known to all of the parties, forbid the application of the rule that title passed to the center of the surrounding water of the lake.

No other construction can be given the description the parties themselves employed. It is the general rule that a deed is to be construed most strongly against the grantor. Doubtful points are construed most strongly in favor of the grantee in order to derogate as little as possible from the grant; for the grantor, if he left the point doubtful, is assumed to be at fault and can not take advantage of a difficulty which he, himself, has created. *Hay v. Storers,* Wright, 711.

"While always a question of construction depending on the true intent of the parties as derived from a consideration of the

whole instrument, specific calls in a description of the boundaries of land for the "edge," "bank," or "shore," of a water course, "pond," or "lake," will, as a rule, be construed to limit the grant or conveyance to the water's edge, and do not confer on the grantee any rights in the bed of the stream, lake or pond." Cyc., Vol. 9, 183.

In streams, lakes or ponds in which the tide does not ebb or flow, low-water mark is the point to which the water recedes at its lowest ordinary stage and not that of an unusual dry season. *McBurney* v. *Young*, 67 Vt., 574.

High water mark is the point to which the water rises at its average highest stage. *Dayton* v. *Cooper Hydraulic Co.*, 7 N. P., 495.

The term "shore" includes and designates the land lying between the high and low water mark.

In the absence of provisions in the deed showing a contrary intent, a deed of land abutting on tidal or non-tidal waters passes whatever title the grantor has to the bank or shore. Cyc. Vol. 29, p. 368. This rule applies to an island as well as to the mainland. *Hill* v. *Lord*, 48 Me., 83.

The state is bound by the same rules in its grants of land as a person, natural or artificial. No rule is made for the state to follow and another and different rule for its citizens, for both the state and people are governed by the same rule.

The deed here calls for 83.89 acres in Orchard Island. There was some evidence offered tending to prove that the island was conveyed with reference to maps, plats and field notes to a contour line run two feet above the level of the old wasteweir. For the purpose of assisting in determining the intention of the parties as to the shore and riparian rights, the court appointed Oliver Richey, the present county engineer, to survey the island, and further directed him to find the quantity of land in the island so contained within the contour line run on the level of two feet above the old wasteweir, being 2.2 feet above the new or present wasteweir. The engineer made such survey and reported that within such a contour line the island contained 61.38 acres. This is evidence conclusive that the island was

not sold and conveyed by the state with reference to maps, plat, field notes, or to such a surveyed line. It may fairly be presumed that all of the land lying between this line as surveyed and low-water mark would be required to fill out the quantity, 83.89 acres, called for by the deed from the state to McClure. This survey, taken with the fact that there was no reservation made and that no reference to such a line was recited' in the deed, proves to the full satisfaction of the court that the state sold Orchard Island to low water mark.

If this view is correct, then what are the rights of the grantee as to water privileges or riparian rights,

"In construing the description in a conveyance which bounds the lands conveyed on a body of water, more liberality must be allowed in interpreting the conveyance because of the difficulty of locating the bounds of such land except by marks on the shore. The courts incline strongly to such interpretation of the language as will pass all the riparian rights to the grantee, and it will be presumed in the absence of a clear showing to the contrary that the adjacent flats and shore to the extent of the grantor's rights therein pass as an appurtenant to the high land." Corpus Juris, Vol. 9, page 181.

What is "riparian land?"

"Generally speaking, all land which belongs to the owner of land immediately abutting on the stream, and not entirely separated from the latter by land belonging to another, that is, land from the end of which the owner may pass continuously over his own land to the stream without having to go upon land not owned by him, is riparian land." Vol. 1, Tiffany on Real Property, 1139.

An island is land surrounded by water, and Sec. 5322, G. C., defines "land" as follows:

"The terms 'real property,' and 'land,' as so used, include not only land itself, whether laid out in town lots or otherwise, with all things contained therein, but also, unless otherwise specified, all buildings, structures, improvements, and fixtures of whatever kind thereon, and all rights and privileges belonging, or appertaining thereto."

To hold under this instrument (the deed) that the state of

Ohio sold and conveyed "Orchard Island" only to a two foot
or a one foot contour line run above the level of the wasteweir,
or that the conveyance was to high-water mark on the "island,"
would be to do violence to the solemnity of contracts under seal
Such a finding would in effect make a trespasser of the state's
grantees, of all who would occupy beyond such a line.  Cer-
tainly such intention was not in the mind of the parties at the
time this conveyance was made.

"A general deed of premises lying upon the bank of a river,
in which is constructed a canal, conveys the grantor's rights
to the center of the stream bounding the property.  *And to re-
serve or exclude from the grant any such rights, the convey-
ance should contain proper words of such reservation or exclu-
sion.*"  *Day* v. *Railroad Co.*, 44 O. S., 406.

It has been contended in argument that the state bought land
bordering on the reservoir back on a level of two feet above the
wasteweir, for the purpose of taking care of the rise of the water
therein.  The state in the case at bar acquired the title in fee
simple to all of the island and conveyed it all, without reserva-
tion.  It is not a question of what the state bought, but rather
what it sold.

"Where canals from a river were constructed for the purpose
of navigation, the owner of each lot abutting thereon acquired
by prescription the same riparian rights in the water therein
that he would have had if the canals had been natural water-
ways."  *Beidler* v. *Sanitary District*, 211 Ill., 828.

Orchard Island as such formed no part of the dam or neces
sary "works" of the reservoir or canal system; consequently,
when the state passed the whole title to it without reservation
by proper deed, executed by its authorized agents, the state re-
leased all the rights to the island it possessed.  It was within the
power of the grantor to make any reservation desired, but not
having exercised the privilege, grantees may enjoy all the rights
grantor possessed.

"Riparian rights are property within the purview of Sec. 19
of the Bill of Rights, of which the owner can not be deprived
without due process of law and just compensation, though taken

for or subjected to a public use. Any actual and material interference with such rights, which cause special and substantial injury to the owner, is a taking of his property." *City or Mansfield* v. *Balliett*, 65 O. S., 451.

The island, as platted into lots, streets, parks, etc., as shown on the plat, contains no margin between the lot and the water. Lot No. 138 is shown to front on the lake, from the northeast corner to the southwest corner, in a circular form, the east line of the lot extending from Oak street 110 feet north, the distance being designated by figures on the plat, and abutting on Oak street, extending west with the street eighty feet to the water. The plat shows these lines and distances to the water. There is nothing on the plat indicating any other purpose or intention than that the lot extends to the water.

"When a plat of subdivision is ambiguous as to what the length of lot lines therein marked refer to, the deeds of the original owner may be resorted to, especially if plaintiff claims under them, to show the depth of the lots and proper location of an alley." *Crane* v. *Buckles*, 1 N. P.; 51; affirmed, without opinion, 52 O. S., 613.

"Conveyance of platted lots which are situated upon the banks of a navigable stream, no part of the bed of the stream being platted, includes all the riparian rights of the grantor in front of said lots to the center of the stream, although such stream is not mentioned in the conveyance. *To exclude such rights, they should be reserved or excepted from the deed.*" *Head* v. *Chesborough*, 13 C. C., 354.

The creation of the reservoir originally was for the purpose of storing water, which facts and circumstances give rise to an easement from necessity, by implication. Purchasers of such land must necessarily take it subject to the rise and fall of the reservoir and the washing of the banks by the waves. Such implication arises from clear necessity. This principle is fully recognized in Ohio. *Meredith* v. *Frank*, 56 O. S., 479.

Estoppel by parol against plaintiff is not, in the judgment of the court, sufficiently proven to warrant the court in granting an interest in land in the absence of any memorandum in writing charging plaintiff.

The finding of the court is that plaintiff owns the land abut-ting on his lot, No. 138, to ordinary low water mark, subject to the right of the state to flow the water of the reservoir as now constructed thereon.

The claim in argument as to the right of defendant to con-nect the proposed walk at the end of Oak street on Orchard Island is not passed on for the reason that necessary parties for the determination of that question are not in court.

Injunction made perpetual as it applies to Lot No. 138 only. The determination of this question is of large benefit to all the parties, and each may pay one-half of the costs.